## THE LILLIE HAMILTON.

### (*District Court, N. D. Illinois.* November 5, 1883.)

1. CONTRACT OF AFFREIGHTMENT—VESSEL UNSEAWORTHY—EVIDENCE.
   Upon examination of the evidence in this case it appears that the vessel was not seaworthy at the time of the disaster, and that libelants were entitled to recover.

2. SAME—IMPLIED WARRANTY AS TO SEAWORTHINESS OF VESSEL.
   There is an implied warranty in a contract for affreightment that the ship is sufficient for the voyage, and the owner, like a common carrier, is an insurer against everything but excepted perils.

3. SAME—SEAWORTHINESS OF HULL.
   To constitute seaworthiness of the hull of a vessel in respect to cargo, the hull must be so tight, stanch, and strong as to be competent to resist all ordinary action of the sea, and to prosecute and complete the voyage without damage to the cargo.

4. SAME—DAMAGES.
   The object of the law in actions of this character is to make the parties to the contract as nearly whole as possible for the damages sustained by reason of the breach of the contract.

In Admiralty.

*Robert Rae,* for libelants.

*Schuyler & Kremer,* for respondents.

BLODGETT, J. This is a libel upon a contract of affreightment, and the facts as they appear in the proof, so far as I deem it necessary to state them for the purposes of this decision, are that, on the twenty-second of June, 1880, the libelants shipped at the port of Chicago, on Lake Michigan, on board the schooner Lillie Hamilton, 19,557 bushels of No. 2 corn, to be transported in said schooner from said port of Chicago to the port of Kingston, on Lake Ontario. While

pursuing her voyage, and in the Welland canal, near the town of
Thorold, the schooner sprang aleak, and sank in the canal, whereby
11,432 bushels of the cargo became wet and damaged, and about
8,050 bushels were recovered in a dry condition.    The dry corn was
afterwards, on the order of libelant, delivered to the underwriters,
who had insured the cargo on payment of a *pro rata* amount. of the
freight on said dry corn.   Libelants had policies of insurance upon
the cargo for the voyage, and on notice of the disaster the cargo was
abandoned to the underwriters, who paid the amount of the insurance;
and this suit is now prosecuted in the name of the libelants for the
benefit of the underwriters, to recover the amount lost on the cargo,
on the ground that the schooner was unseaworthy at the time the voy-
age was commenced, and that the loss was occasioned by reason of
such unseaworthiness, and not by a peril of the sea.    The proof
shows that the schooner was what is known as a canal vessel,—that
is, a vessel adapted to pass through the Welland canal; that the in-
jury to the cargo was in consequence of a hole being stove through
the bilge streak near the bluff of the bow.

The testimony shows that the vessel was tight, and had taken in
no such amount of water as to indicate a dangerous leak, until after
she had passed O'Neill's bridge in the Welland canal, and was be-
tween said bridge and Thorold, when she struck upon something like
a stone or rock near the bottom or side of the canal, the shock of the
blow being such as to be plainly noticeable on board of the vessel.
Some of the witnesses say that it produced a momentary stoppage,
others that she was heeled or canted over by the blow, but did not
stop.   Immediately after this shock or blow was felt, the schooner be-
gan to take in water very rapidly, and sank to the bottom of the canal
in about 15 minutes.    At the time of the accident the schooner was
drawing about 10 feet of water, and the depth of the canal was about
11 feet, thus leaving only about a foot of water between the bottom
of the schooner and the bottom of the canal.    An investigation of the
planking at the point where the leak occurred showed that the planking
along the bilge, near the bow, was worn away from a thickness of four
or five inches, so that its thickness did not exceed an inch and a half,
and that the hole in question was occasioned by breaking through this
thin-worn planking, making a clear opening of about eight by nine
inches.   The proof also shows that this schooner came out in 1874, and
had not been replanked along bilge streaks where this hole was broken
through; that canal vessels wear away very rapidly, especially at or
near the bilge, by chafing and colliding against the sides and bottom
of the canal; and that from four to five years is as long as plank in the
bilge streak is expected to last on a vessel in this service, and that the
planking, when new, is from three to five inches thick.   This schooner,
like all canal vessels, was nearly flat-bottomed, and the canal is so
narrow, and the sides and bottom of a vessel loaded as the Lillie
Hamilton was come so nearly in contact with the sides and bottom

of the canal, that the least sheer and deflection, or even roll of the vessel, is liable to bring the bilge in collision with the sides and bottom of the canal, and therefore as soon as the planking is worn as thin as it appears without dispute it had become on this vessel, there is not sufficient strength to resist the blows and shocks incident to a canal passage. A hull might withstand the strain of the winds and waves, but not be adequate to the peril of the canal; that is, her frame might be so stanch and strong as that her seams would not be opened by any pitching or rolling which she might encounter upon the open lake, and yet be in peril from collision on the canal, when her planking was worn so nearly away.

I conclude, therefore, from the proof, that the planking along the bilge streaks of this vessel had become worn so thin and unsubstantial as to make her unseaworthy for this service; that there was not sufficient substance to enable her to resist the shocks and collisions to which she was ordinarily and almost necessarily exposed in passing through this canal. It is true that apparently credible witnesses have testified that, in their opinion, a hole would have been broken in this schooner's bottom from the collision in question even if the plank had been three inches thick. The reply to this testimony, which seems to me sufficient, is, if this plank had been new and strong, and of such thickness as is usually deemed necessary to secure safety, then the carrier might, perhaps, be exonerated on the ground that the vessel was seaworthy in that regard, but none of the respondent's witnesses have given it as their opinion that one and one-half inches of six-year old plank is sufficient to raise the presumption of seaworthiness, or to show that this vessel was strong enough to withstand the dangers of canal navigation. No one has said that a prudent ship-owner would consider a ship seaworthy if he knew the bilge planking had been worn away from the thickness of four or five inches, at the time the vessel was built, to a thickness not to exceed one and one-half inches. It is clear that to resist the abrasions and blows to which a vessel is liable in this canal, much more than one inch and a half of plank is necessary. A fair test, as it seems to me, is, would a prudent man build a vessel for such service with planking only one and one-half inches thick? The law upon the subject of the implied warranty of seaworthiness is too well settled to admit of discussion.

Chancellor KENT (3 Kent, Comm. 205) says:

"By the contract the owner is bound to see that the ship is seaworthy, which means that she must be tight, stanch, and strong, well furnished, manned, victualed, and in all respects equipped in the usual manner for the merchant service in such a trade. The ship must be fit and competent for the sort of cargo, and the particular service for which she is engaged. If there should be a latent defect in the vessel unknown to the owner, and undiscoverable upon examination, yet the better opinion is that the owner must answer for the damage occasioned by the defect. It is an implied warranty in the contract that the ship be sufficient for the voyage, and the owner, like a common carrier, is an insurer against everything but the excepted peril."

In *Putnam* v. *Wood*, 3 Mass. 481, the court said:

"It is the duty of the owner of the ship, when he charters her, or puts her up for freight, to see that she is in a suitable condition, and to keep her in that condition, unless prevented by perils of the sea or unavoidable accidents. If the goods are lost by any defects in the vessel, whether latent or visible, known or unknown, the owner is answerable to the freightor upon the principle that he tacitly contracts that his vessel shall be fit for the use for which he employs her."

In *Dupont* v. *Vance*, 19 How. 162, the supreme court of the United States said:

"To constitute seaworthiness of the hull of a vessel in respect to cargo, the hull must be so tight, stanch, and strong as to be competent to resist all ordinary action of the sea, and to prosecute and complete the voyage without damage to the cargo."

In *Work* v. *Leathers*, 97 U. S. 379, it is said:

"Where the owner of a vessel charters her, or offers her for trade, he is bound to see that she is seaworthy and suitable for the service in which she is to be employed, and if there be defects, known or not known, he is not excused."

I conclude, from the proof and these authorities, that this vessel was not seaworthy at the time of this disaster, and have no doubt that libelants are entitled to recover the damage sustained by reason of such unseaworthiness.

The object of the law, in actions of this character, is to make the parties to the contract as nearly whole as possible for the damages sustained by reason of the breach of the contract. As I have already said, this suit, it is admitted, is prosecuted for the benefit of the underwriters, who have paid the amount insured by them upon this cargo. It is admitted that there was delivered to the underwriters, upon the order of libelant, 8,050 bushels of this corn, and that the underwriters paid a *pro rata* amount of the freight upon the quantity so delivered, and that the wet corn was sold by the owner of the vessel and the proceeds received by him. In the absence of any proof showing that the corn was worth less to the underwriters at the point where they received it than it would have been at the port of destination, I am inclined to the conclusion that the acceptance of the corn by the underwriters at Thorold, and payment of freight thereon, so far as earned, was a settlement *pro tanto;* but as there is not, at present, proof sufficient in the record to determine the value of the wet corn, it is probable a reference must be had to ascertain the damages in the case, unless the parties agree.