### THE OLYMPIA.

(District Court, D. Oregon. October 7, 1907.)

No. 4,798.

1. SHIPPING—CONTRACT FOR CARRIAGE OF HORSES—LIABILITY FOR BREACH.

A shipment of a number of horses from Nome to Seattle *held* to have been made under a contract made by the parties partly by correspondence and partly by oral conversations, all of which must be taken into account to ascertain its terms, and, as so construed, to have required the shipowner to construct stalls for the horses between decks, and slings for use in rough weather, the failure to provide which rendered the vessel liable for injury to the horses during the voyage.

2. SAME.

Where the terms and conditions upon which horses were to be carried on a vessel had been fully agreed upon by the shipper and vessel owner, a subsequent contract signed when the horses were loaded, at the instance of the carrier, by the shipper's head teamster without authority from the shipper, and differing materially in its terms from the previous agreement, was void.

**8. Same—Measure of Damages.**

A shipper *held* entitled to recover for property lost during the voyage through the fault of the carrier the value of such property at the place of shipment, together with the freight paid thereon.

In Admiralty.

Wm. C. Bristol, for libelant.

John P. Hartman and Williams, Wood & Linthicum, for respondent.

WOLVERTON, District Judge. This is a libel to recover for loss alleged to have been sustained by reason of failure on the part of the respondent to carry and deliver in good order 15 head of horses from Nome, Alaska, to Seattle, Wash. It is asserted by libelant that the respondent agreed with it to carry the horses between decks, for the consideration of $45 per head, but that, in violation of such agreement, said respondent carelessly and negligently exposed the horses to the weather and storms upon the upper deck, by reason whereof 4 of them died, and the remaining 11 were rendered sick and badly bruised and damaged. The respondent relies upon a contract alleged to have been entered into between the Northwestern Steamship Company, the claimant, and one O'Hara, who, it is alleged, was the authorized agent of the libelant. Libelant first contemplated shipping the horses from Teller, a point situated many miles north of Nome, and entered into a correspondence with the representatives of the Northwestern Steamship Company concerning the matter. On September 10, 1904, F. P. Kendall wrote Mr. Perkins, of the Northwestern Commercial Company, an allied company with the Northwestern Steamship Company:

"Mr. Bernard tells me the 'Tacoma' will sail from Teller for Seattle about Sept. 15th. If such be the case, I would be willing to ship some ore by her, and probably also my horses, but I must know positively regarding the matter. I can get freight rates of $5.00 per ton on the ore and $35.00 each on the horses from Nome. If the 'Tacoma' is to sail about the date mentioned above and you will take the freight at rate specified, please send me word by return of 'Augusta' or by messenger to York if possible, and I will arrange accordingly."

Perkins answered on the 12th, saying:

"Yours of September 10th at hand. Mr. Ogilvie has covered the main points necessary in reply to the same. We are making you a ship's tackle rate of $4 on the ore. Such as is to be landed at the wharf and relightered to either the Tacoma or Olympia, we shall have to add to this a lighterage charge. We cannot take any ore at York or Lost river unless you have a guarantee of at least 50 tons, as Mr. Williams has already written you. The rate on horses is $45.00 either from here or from Teller. The Tacoma will not leave as early as you state in your letter."

On September 15th the North Coast Lighterage Company, another concern allied with the Northwestern Steamship Company, wrote the Northwestern Commercial Company as follows:

"Should a representative of the American Tin Mining Co. bring their horses to the entrance of Grantley Harbor across from Teller to be shipped on the S. S. Tacoma this fall you will please furnish them our large lighter and give them any assistance you can to get these horses to Teller, and assist them in finding some accommodations to take care of them while waiting for the steamer. We expect to ship these horses on the Tacoma on her return from Siberia."

And on the same day wrote the American Tin Mining Company at York:

"We beg to state that our steamship Tacoma should arrive at Teller, Alaska, about September 25th. After discharging cargo there she will proceed to Siberia, and return about September 30th or October 1st. We will take your horses at the rate of $45 per head, you to furnish your own feed and man to take care of horses. I would suggest that you have your horses at Teller by the 28th, and wait there until the arrival of the Tacoma, but should anything happen to the Tacoma that she should not come back to Teller, I would suggest that you do not wait longer than the 8th of October. After that drive your horses to Nome and we will take them out on either the S. S. Olympia or Victoria. I believe you can find stable accommodations at Teller, and this will be much better than attempting to keep your horses at the Reindeer Station. We have a large lighter at Teller, and you can have the use of this lighter to transfer your horses from one spit to the other at the entrance of Grantley Harbor. We will have the stalls built in the lower between decks of the Tacoma as soon as some part of her hold is empty. By putting the horses down below they will be much more protected from the cold and wind."

On September 24th the North Coast Lighterage Company, by George T. Williams, its president, again wrote F. P. Kendall, the manager of the American Tin Mining Company:

"I beg to quote you a rate of $45.00 per head for horses from Nome to Seattle on the S. S. 'Olympia,' we to furnish 25 pounds of feed per day while en route; this is based on ten pounds of oats and fifteen pounds of hay which is the same as the U. S. government allowance in transporting army horses. We will also have the N. W. C. Co. furnish such feed to your men who have charge of your horses while they are at Nome waiting for the steamer, at the regular market rates at the time of furnishing same. The bill for this feed and the freight on the horses will be sent to our Seattle office for collection, it being our understanding that you will be in Seattle at the time of their arrival. It is understood that you furnish your own men for taking care of the horses while on board the steamer. Trusting that we may have the pleasure of your business, we are."

This letter bears an indorsement at the left-hand corner near the bottom of the sheet in form as follows:

"Accepted. American Tin Mining Co., F. P. Kendall, Gen. Mgr."

On the previous day, to wit, September 23d, the American Tin Mining Company, through F. P. Kendall, its vice president, gave the Northwestern Commercial Company a letter introducing Mr. Neil O'Hara, who is described as "our head teamster," and "who," it is said, "will have charge of our horses from Nome to Seattle, as per arrangements perfected with Mr. Williams today. Please furnish what feed Mr. O'Hara requires for the horses in Nome, and also give him whatever other assistance you can, and greatly oblige."

In connection with these letters, Kendall testifies that he met Williams in Nome some where about the 15th to the 18th of September, and arranged with him for the transportation of the horses. Prior to that he relates that he had written to Williams in August touching such an arrangement. He says further:

"It was a proposition on my part for a freight rate on horses and ore, and an agreement on the part of Mr. Williams to take the horses and ore at certain rates. * * * Concerning the horses particularly, I stipulated that the horses should be taken between decks; that they should be provided with suitable stalls, and slings to be used in case of rough weather. * * * This was

agreed to by Mr. Williams; but he stipulated that the freight rate on the horses should be $45, if he was to furnish stalls and slings. It was also understood that the ship should furnish necessary feed for the horses during the voyage, which should be included in this freight rate of $45 each, but that we were to furnish the men to feed the horses * * * on the voyage from Nome to Seattle. * * * The original understanding was made that the horses should be shipped on the Tacoma, because she was the first vessel going on. * * * There was a question, as there always is in that country, about sailing dates. Vessels are delayed on account of rough weather. * * * Mr. Williams said it was possible that the Tacoma might be late, and in such case he could take the horses on the Olympia, which would be the next vessel sailing. The Olympia, however, was not going north of Nome. Consequently, if we decided to ship on the Olympia, we would have to take the horses to Nome. And when we left camp at York, O'Hara, who was our head teamster, had charge of the horses with the idea of taking them to Teller, which he did. But we learned that the Tacoma had not yet arrived at Nome. Consequently, O'Hara took the horses through to Nome to await the arrival of the Olympia, which would undoubtedly discharge and leave for Seattle before the Tacoma made her Siberian trip and returned to Nome."

After having this conversation and understanding with Williams, the witness returned to York, and a little later came back to Nome. It was while in Nome on this last trip that the letter of September 24th was written, and the acceptance noted thereon. Kendall claims that the contract was thus completed by the receipt of the letter of the 24th, but that the entire contract comprehended the prior letters exchanged between the parties and this understanding with Williams, as related by the witness.

Williams testified at the trial, in effect, that there was some conversation in regard to the between decks for the stock on the Tacoma, by reason of the fact, as he asserts, that that was the only place they could carry stock on that boat, leaving the inference or impression that the discussion did not extend to the Olympia or other boat, and therefore that there was no understanding that the horses were to be carried between decks on the Olympia. In a deposition taken some time before the trial, he states:

"I also suggested, in case the steamship Tacoma should not arrive at Teller by the 8th of October, that he best drive his horses overland to Nome, and we would carry them on the steamship Olympia or Victoria. I also stated that we would erect the horse stalls in the upper 'tween decks. About the middle of September Mr. Kendall arrived in Nome and stated his horses were on the way overland from Teller to Nome, and he was going out before they arrived, and asked me to give him freight rates in writing, which I did on the 24th day of September. After his horses arrived, in care of Mr. O'Hara, we shipped them to Seattle at the rates quoted Mr. Kendall, on the conditions of our regular stock contracts. While I agreed to place the horse stalls in the 'tween decks of the Tacoma, I did not agree to place any horse stalls on the 'tween decks of the steamship Olympia, for the reason this steamer has plenty of deck space, and the horse stalls were already erected, and the same was satisfactory and accepted by Mr. O'Hara."

O'Hara testifies that the letter of the 24th of September was handed him by Williams; that Kendall had left the same with Williams to be given him, with other instructions relating to the shipment of the horses; that when he inspected the ship Olympia he was informed that the horses were to be carried on deck (meaning the upper deck); that he protested that was not the understanding, with both the captain and

Mr. Williams; that the captain assured him the stock would be carried safely there, but that Williams informed him that it would cost too much to arrange stalls between decks, and they could not do it, and, further assured him that the captain would fix the stalls so that the horses would be perfectly safe. While the stock was being put aboard, O'Hara signed, with the Northwestern Steamship Company, what is termed a "Stock Contract," at the instance of a clerk of the company, but without reading the same. This instrument purports to be an agreement between the Northwestern Steamship Company of the first part and the American Tin Mining Company of the second part, whereby the steamship company agrees to furnish the second party standing room for 15 head of horses on its steamer Olympia. It is further stipulated that the horses shall be carried at the sole risk of the owner or shipper, unless damage or loss occur through the willful misconduct of the officers or employés of the steamer; that such owner or shipper shall, at his own cost and charge, provide and supply suitable and sufficient food for use of the said live stock while on board the steamer; and that the value of said live stock fixed by the shipper or owner is the sum of $100 each. In this relation Williams testifies in his deposition that, after O'Hara had been aboard the boat and returned, he stated to him (witness) that "the horse stalls on the upper deck would be all right, and he would ship his horses in accordance with our regular stock contracts." But on his examination at the trial he was asked:

"Did you have a talk with him at the time he came back as to the place on the ship where the horses were to be carried?"

To which he answered:

"No, sir; I only mentioned where they were to be carried before he went out. That is why I wanted him to look at them."

Stalls were eventually constructed on the deck of the Olympia, upon the port side, near the bow, and the horses when taken aboard were confined for carriage therein. The manner in which these stalls were constructed is gone into with much detail under the testimony, but it is not essential to elaborate it here. Capt. O'Brien, who was in charge of the ship on her voyage, relates that about six hours out of Unimak Pass he encountered a southerly wind, which increased in violence until in 48 hours it was blowing a living gale. In further description he says the storm was unusual for that time of the year, but that worse storms occur later in the season, and, when asked whether it was a dangerous storm, he answered:

"No particular danger, not to lives or the ship itself. * * * It is a good smart gale of wind; caused people to feel uneasy, those that aren't familiar with the ocean."

It is otherwise related that the boat listed and rolled to an angle of from 25 to 30 degrees, which caused the stock to become frantic, and that during the storm some of the stalls went down, and the horses had to be secured again and the stalls repaired. O'Hara asserts that all of the stalls came down at one time. Johnson says that six or eight of the horses were down in a heap; but Capt. O'Brien denies that more

than two or three were down at any one time. Thus it appears that the stalls were insecurely constructed, and, although they were covered with boards, the horses were much exposed to the weather, and contracted colds, and, by reason of the faulty construction of the stalls and their collapse, the horses, or a number of them, were hurt and bruised to such an extent that pus accumulated, and the parts affected were required to be lanced. A veterinary surgeon was employed to attend the animals that survived the voyage, for the space of about three months, when they were taken to Portland. This statement comprises the most pertinent and salient features attending the arrangement for and shipment of the horses in question, together with a brief outline of the injuries sustained.

The primary question for consideration relates to the controlling agreement between the parties for the carriage of the horses. From a careful review of the entire evidence, I am impelled to the conclusion that an agreement was reached through the correspondence alluded to and the verbal negotiations of the representatives of the companies concerned, substantially as related by Kendall, which was, in effect, in its final acceptance: That the Northwestern Steamship Company would carry the horses on the steamship Olympia between decks from Nome to Seattle, for the consideration of $15 per head, and deliver them at the latter point in good order and condition; the steamship company to furnish 25 pounds of feed per day each for the horses while in transit. This arrangement was not concluded fully until the letter of September 24th, with its acceptance by the American Tin Mining Company, was left with Williams to be delivered to O'Hara with other instructions for shipping the horses. Nor am I of the opinion that this letter constituted the entire contract. It was but one of the elements going to make up the agreement of the parties, and was intended, and is to be read, in connection with the other parts of the correspondence between the parties, and their verbal understanding in the meanwhile. There was no apparent purpose, or any attempt of the parties, to reduce their entire negotiations to a simple written agreement, and hence it cannot be said that the last letter written comprises the entire agreement so as to bring it within the rule that the final writing excludes all former statements concerning the terms of the contract. I am also as firmly impressed that the alleged live stock contract is without validity, for the reason that O'Hara was without authority from the libelant to execute it. He was but the American Tin Mining Company's teamster, with instructions to ship the stock in accordance with the directions which Kendall had left for him. It is manifest it was not within the purpose of Williams and Kendall that such a contract should be entered into, for it is palpably inconsistent in a very material particular with the statement contained in Williams' letter of the 24th. I refer to the stipulation to furnish 25 pounds of feed each day per horse shipped, while the alleged O'Hara contract required the shipper to supply the feed necessary for such purpose. There cannot be two valid contracts with incongruous provisions concerning the same matter, and so I am induced to hold that the agreement, as alleged and relied upon by the libelant, is valid and binding, and that the alleged O'Hara live stock contract is a nullity.

It may be further remarked that the live stock contract was not a technical bill of lading. Such an instrument is usually issued by the carrier after the goods have been taken aboard, and it often recites particular conditions, which are binding upon both the shipper and carrier. The Delaware, 14 Wall. 579, 20 L. Ed. 779. But the contract in question purports to be one of special agreement for the carriage of a particular commodity, and is such a one as a person acting in the relation of O'Hara to the American Tin Mining Company would not ordinarily be authorized to make or execute for and in behalf of the company. This being so, it follows that the steamship company, not having shipped as per agreement, is liable for the loss and damages arising on account of the injury sustained by the horses.

It is insisted, however, that, because O'Hara shipped the horses notwithstanding he was advised that they would be carried on the upper deck, it was tantamount to an agreement that they should be so carried. I am not convinced that such is the case. O'Hara was helpless to do otherwise, and the Olympia was the last boat going out that season for Seattle. But, if it be so conceded, it must then be held that the boat was at fault in failing to provide staunch and suitable stalls and appliances for carrying the horses upon the voyage safely and without injury. That a portion, if not all, of the stalls went down during the stress of weather, has been shown. This was in large measure the cause of exposure and injury to the horses. Beyond this, the testimony tends to show that the stalls were not so constructed at the outset, and provided with slings and cushions, as to prevent bruising and chafing through the tossing and pitching of the boat. But three slings were provided when the ship went out. Later, when the stress of weather was encountered, other slings and supports were improvised, and cushions were attached, to relieve the situation so far as possible; but, notwithstanding, there was great exposure and injury. The wind and storm, if it may be called such, were characterized as unusual for that season of the year, but accompanied by "no particular danger." "A good smart gale of wind," as described by the captain. While the boat pitched and tossed considerably, it was not more than might have been expected, and the plight was one that should have been provided against. The stress of weather and the sea encountered were not such therefore, considering the voyage and the course thereof, and the conditions of the elements usual or that might be expected while en route, as may be denominated "perils of the sea," and the ship is not relievable against the damages sustained by libelant by reason thereof.

This leaves the question of the amount of damages to be considered. One item is the value of the four horses that were lost. The only testimony on the subject of value is that of Kendall and another witness. The horses were purchased in Seattle some time prior to June, 1904, for shipment to Alaska, at the rate of $450 to $575 per team. There does not appear to have been any market value of horses in and about Nome at the time they were shipped. Kendall testified that horses were worth $300 per head, and referred to an instance of a sale at that figure. But he was not acquainted with the market value, and for the very good reason that there was no subsisting market in that locality. I take it, however, that the horses were worth as much in Nome as in Seattle, if

not more. They could not be had in Nome, and it was necessary to secure them abroad and take them in, so that the value was at least what they cost abroad. No specific value was placed upon the four horses lost, and I cannot say that it was above the minimum paid for any of the whole number.

Hence I will assess the damages at $225 per head for the horses lost, or an aggregate of $900. To this should be added the freight charges paid thereon, namely, $45 for each horse, or $180. The Hugo (D. C.) 61 Fed. 860; The Lillie Hamilton (D. C.) 18 Fed. 327. I allow also $300 for injury and damages to the remaining 11 head.