GOEPEL et al. v. HAMBURG AMERICAN PACKET CO. et al.

(District Court, S. D. New York. September 25, 1911.)

1. CARRIERS (§ 83*)—CARRIAGE OF GOODS—LIABILITY FOR MISDELIVERY.

A firm of importers of Italian fruits conducted their business on bankers' credits furnished by libelants under an arrangement which had been maintained for years, and by which, a credit for a certain sum having been arranged for, the shippers in Italy made drafts at 90 days on libelant's London correspondent, to which they attached duplicate bills of lading calling for delivery to order and indorsed by them. On acceptance of the drafts, the London bank transmitted such bills to libelants, who turned them over to the importers, taking from them a trust receipt by which they agreed to receive the fruit as agents for libelants, and hold the same or its proceeds to be applied in payment of the drafts. The respondent steamship companies issued a third bill of lading, stamped, "Duplicate—Not Negotiable," which the shipper forwarded, unindorsed, to the importers. On receiving one of the bills of lading from libelants, the importers had the goods entered at the customhouse thereon, paid the estimated duty, and received a permit on which they obtained delivery from the carrier. They made all their bank deposits in one account, and did not, and were not required to, keep the proceeds of such shipments separate, but on notice gave libelants a check to meet each maturing draft. In the case of certain shipments of lemons from Palermo, the importers indorsed the name of the shipper on the "Duplicate—Not Negotiable" bill of lading, had the goods entered thereon at the customhouse, and received a permit on which the lemons were delivered to them and sold. In some of such cases they subsequently obtained the original bill of lading from libelants, and in some they did not. Libelants did not learn of such action until the importers had become insolvent and failed to provide for the drafts. *Held*, that neither the relations and course of business between libelants and the importers, nor a custom of the port to make delivery on the customhouse permit, nor the fact that the customs officers issued such permits on invalid bills of lading, relieved the carriers from the effect of the settled rule that they were authorized to make delivery only on the genuine bills of lading properly indorsed, and that they were liable to libelants for any damages sustained by them by reason of such wrongful deliveries.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 83.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CARRIERS (§ 93*)—CARRIAGE OF GOODS—LIABILITY FOR MISDELIVERY—RATIFICATION OF UNAUTHORIZED DELIVERY.

The delivery of the genuine bills of lading by libelants to the importers in some cases, after the latter had obtained and sold the goods, did not operate as a ratification of the previous deliveries, of which libelants had no knowledge.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 356–362; Dec. Dig. § 93.*]

3. CARRIERS (§ 94*)—SUIT FOR MISDELIVERY OF GOODS—MEASURE OF DAMAGES.

In a suit in admiralty to recover for breach of maritime contracts to carry and deliver goods, which were wrongfully delivered to another when libelants held the bills of lading properly indorsed, the measure of damages recoverable is not the value of the goods, as for a conversion, but the amount of libelant's actual loss; and where libelants held the bills of lading as security for bank credits furnished by them to the real importers of the goods, on which the same were bought, and delivery was made to such importers, who in fact applied the net proceeds of the goods after payment of freights, insurance, duties, and other expenses to the payment of such credits, so that libelants received all they could have realized therefrom had they taken and sold the goods themselves, they sustained no damage which is recoverable from the carriers.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 94.*]

4. AUCTIONS AND AUCTIONEERS (§ 10*)—PROCEEDS OF PROPERTY—REPAYMENT OF ADVANCES MADE BY AUCTIONEER.

Advances made by an auctioneer on goods received by him for sale and deducted from the proceeds after sale are in law a part of such proceeds, and not loans so far as affects the rights of a lienholder entitled to the net proceeds, and who received the benefit of the advances.

[Ed. Note.—For other cases, see Auctions and Auctioneers, Cent. Dig. §§ 44–47; Dec. Dig. § 10.*]

5. CARRIERS (§ 94*)—SUIT FOR MISDELIVERY OF GOODS—DAMAGES.

Where, under an arrangement by libelants as bankers to furnish credits for the purchase of merchandise by importers by means of acceptances of drafts at 90 days, which arrangement had continued for a number of years, it was the custom of libelants, who received the bills of lading as security, to deliver them to the importers, who obtained and sold the goods, depositing the proceeds in their general bank account on which they drew checks for the amount of the drafts as they matured, and libelants paid no attention to the proceeds of the particular shipments, they did not sustain damages recoverable from the carriers because of the fact that shipments which had already been made and for which drafts had been accepted but had not matured were wrongfully obtained by the importers without the bills of lading, and sold a few days earlier then they would otherwise have been, where it did not appear that they brought less than they would later, and libelants received the benefit of the proceeds.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 94.*]

In Admiralty. Suit by Carl Goepel and others against the Hamburg American Packet Company and others, with eight other cases against different defendants. Decree for defendants.

Fred. W. & Alfred E. Hinrichs (Fred. W. Hinrichs, of counsel), for libelants.

Wheeler, Cortis & Haight (Clarence Bishop Smith, of counsel), for Hamburg Amercian Packet Co.

Ullo, Ruebsamen & Yuzzolino (Lorenzo Ullo, of counsel), for Mediterranean & N. Y. S. S. Co. and the Steamships Giulia and Citta di Napoli.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Convers & Kirlin (J. Parker Kirlin and John M. Woolsey, of counsel), for Prince Line, Limited, and the Steamships Il Piemonte and Cerea.

Lord, Day. & Lord (Herbert C. Lakin and Lloyd L. Jackson, Jr., of counsel), for Cunard S. S. Co.

Burlingham, Montgomery & Beecher (Morton L. Fearey and G. H. Robinson, of counsel), for Oceanic Steam Navigation Co.

William J. Underwood, for Brown & Seccomb.

McElheny, Bennett & Sicher (Victor K. McElheny, Jr., William M. Bennett, and Dudley F. Sicher, of counsel), for Fruit Auction Co.

Breed, Abbott & Morgan, for W. H. Westervelt & Co.

HOLT, District Judge. These are nine suits in admiralty, five of which are suits in personam against the Hamburg American Packet Company, the Mediterranean & New York Steamship Company, the Prince Line, Limited, the Cunard Steamship Company, and the Oceanic Steam Navigation Company, and four of which are suits in rem against the steamships Il Piemonte, Giulia, Cerea, and Citta di Napoli. They were all brought by the same libelants, the firm of Schulz & Ruckgaber, to recover damages alleged to have been caused to the libelants by the unauthorized delivery by the steamships and steamship companies sued of certain shipments of lemons, the bills of lading for which were held by the libelants. The suits, by stipulation, have been tried together. They were originally brought only against the steamships or the steamship companies which imported the lemons; but subsequently in most of the cases W. H. Westervelt & Co., the importers of the lemons, and Brown & Seccomb and the Fruit Auction Company, fruit auctioneers who sold the lemons, were brought in as defendants on petition by analogy to the practice under the fifty-ninth admiralty rule. A large amount of testimony has been taken, and elaborate and able briefs have been presented by the various counsel in the case; but the evidence, although somewhat complicated, is not contradictory in its material portions, and the substantial facts in the case are not in controversy.

[1] In the spring of 1905 the libelants were, and for many years had been, bankers, doing business at New York under the firm name of Schulz & Ruckgaber. W. H. Westervelt & Co. were and for many years had been importers at New York of lemons and Italian fruit. Fruhling & Goschen were bankers doing business at London, and acting as correspondents of Schulz & Ruckgaber, and the firms of N. & P. Zito and Zito, Maniscalco & Co. were fruit dealers at Palermo, Sicily. Westervelt & Co. and Schulz & Ruckgaber had had dealings for more than 20 years, Westervelt & Co. originally buying exchange from Schulz & Ruckgaber. For about 10 years before 1905 Westervelt & Co. had a line of credit with Schulz & Ruckgaber for their importing business. Originally the limit of such credit was £5,000 in the aggregate. Afterwards it was increased from time to time until in 1905 such limit was £12,000. It was also agreed between them that on each grant of a credit Westervelt & Co. should deposit with Schulz & Ruckgaber $1 for each £1 of credit. The regular method in which the business was done was this: When Westervelt & Co.

were about to purchase fruit in Italy, they made an application on a printed form to Schulz & Ruckgaber, stating the amount of credit wanted, the time of payment of the draft, which was generally 90 days after acceptance, the date, and the names of the merchants authorized to draw on the credit. No particular steamer was named in the application. The credit asked was usually a round sum, as, for instance, £2,000, and did not mention or apply to any particular shipment. Several shipments were often made under one credit. If such application for credit was accepted, Westervelt & Co. signed and delivered to Schulz & Ruckgaber a so-called "credit receipt." By this document Westervelt & Co. acknowledged the receipt of a confirmed cable credit on Fruhling & Goschen for the specified amount in favor of the specified shippers, and, in consideration thereof, agreed to provide previous to the maturity of the bills sufficient funds to meet their payment, and that all property that should be purchased or shipped in compliance with the terms of such credit, and the proceeds thereof, and the policies of insurance thereon, together with the bills of lading, were thereby pledged and hypothecated to Schulz & Ruckgaber as collateral security for such payment, and for the payment of any other obligation due or to become due to Schulz & Ruckgaber from Westervelt & Co., and were held subject to their order, on demand, with authority to take possession and dispose of the same at discretion for their security or reimbursement. At the same time a dollar for every pound of the credit was paid by Westervelt & Co. to Schulz & Ruckgaber. Schulz & Ruckgaber thereupon cabled the terms of the credit granted to Fruhling & Goschen at London. Westervelt & Co. thereupon purchased fruit in Italy, and notified the sellers to draw for the price on Fruhling & Goschen. The sellers, then, in the usual course of business, shipped the fruit, received from the steamship companies two bills of lading which recited that two bills had been issued, one of which accomplished the other to stand void, and also another bill of lading similar to the two above mentioned, except that the words "Duplicate—Not Negotiable," were stamped on its face. All these bills provided, in substance, in the usual form, that the bills of lading duly indorsed should be given up by the steamer's consignee in exchange for a delivery order. The sellers then drew a draft on Fruhling & Goschen for the price of the fruit, annexed to it the two original bills of lading and a consular invoice, and sent them through banks to Fruhling & Goschen, at London, and at the same time sent the "Duplicate—Not Negotiable" bill of lading to Westervelt & Co. Fruhling & Goschen, on receipt of the documents, accepted and returned the draft to those who presented it, and mailed one of the bills of lading and the consular invoice to Schulz & Ruckgaber. and sent to them the other bill of lading by the following mail. Schulz & Ruckgaber, on receipt of the documents, notified Westervelt & Co., who thereupon called on Schulz & Ruckgaber, and received sometimes one and sometimes both of the bills of lading, and gave therefor a trust receipt. By this trust receipt Westervelt & Co. acknowledged the receipt from Schulz & Ruckgaber of the merchandise specified in the bill of lading, and declared that they held and agreed to hold it on storage as the property of Schulz & Ruckgaber, with the liberty to sell the same

as their agents for their account, and to account for the proceeds when received to them; that said proceeds should be applied to the payment of the bills of exchange drawn for the purchase of said goods, unless said bills were otherwise paid or provided for satisfactorily to said Schulz & Ruckgaber; that until sale Westervelt & Co. were to keep said property insured against fire, said insurance being payable in case of loss to Schulz & Ruckgaber, with the understanding and agreement that they were not to be chargeable with any expenses incurred thereon, and that they should retain the legal title to, and have the right to possession of, said property and of the proceeds thereof at all times until said bills of exchange were paid or otherwise provided for satisfactorily to said Schulz & Ruckgaber; that it was the intention of such receipt to protect and preserve unimpaired the ownership, the title, rights, and interests of Messrs. Schulz & Ruckgaber in and to said property and the proceeds thereof; that this arrangement was also to confirm to said Schulz & Ruckgaber all their rights under the credit receipt under which said property was imported; and that Westervelt & Co. were to act in the premises entirely as the agents of said Schulz & Ruckgaber.

In-the ordinary and usual method of proceeding, Westervelt & Co., upon receipt of the original bills of lading from Schulz & Ruckgaber, took one of the bills of lading to the customhouse, duly entered the merchandise, paid the estimated duty, and received a customhouse permit for the delivery of the goods. Upon presentation of such permit to the steamship, the goods were discharged from the steamship upon the dock. Thereafter, according to the usual custom of selling green fruit in New York, the goods were sold at auction on the dock by fruit auctioneers, who usually made considerable advances on the fruit to Westervelt & Co., and who, after the sale, accounted to them for the proceeds of the sale, after deducting advances, commissions, and charges of any kind. Westervelt & Co. deposited all moneys received from all sources in one bank account. About from 12 to 20 days before the maturity of any draft accepted by Fruhling & Goschen, Schulz & Ruckgaber sent to Westervelt & Co. a statement of the amount required to pay the draft, crediting Westervelt & Co. with the deposit already made of a dollar for every pound of the credit, and with any other proper credits, and Westervelt & Co. thereupon sent them a check for the amount called for by the statement. Westervelt & Co. never sent Schulz & Ruckgaber any account of the sales of the fruit, and they never kept the proceeds of the business in a separate account, and they were never requested to do so. They were never asked, and never undertook, to pay to Schulz & Ruckgaber the exact proceeds of any specific importation. All their payments, after the introductory payment of a dollar for each pound of credit, were payments of the amounts or on account of the amounts necessary to put the bankers in funds to meet specific drafts maturing.

During the year 1905, up to June 7th, when the business relations between Westervelt & Co. and Schulz & Ruckgaber ceased, Westervelt & Co. imported nearly 50 different lots of lemons, of which all but 17 lots were entered in the manner above described. Seventeen lots, however, were entered differently, and, as the libelants claim,

without authority, and are the subject of these suits. The difference in the manner of entering these 17 shipments was this: After the shipments arrived, Westervelt & Co., instead of obtaining from Schulz & Ruckgaber the original bills of lading, sent them by Fruhling & Goschen, took the "Duplicate—Not Negotiable" bill of lading, which had been sent to Westervelt & Co. by the shippers, and entered the merchandise at the customhouse upon it. All the bills of lading, the two sent forward with the draft to London and the one sent to Westervelt & Co., were signed by the respective steamship companies, and provided that the merchandise was deliverable "to order," and were alike in all respects except that the two sent to London were indorsed in blank by the shippers, who were either N. & P. Zito or Zito, Maniscalco & Co., while the one sent to Westervelt & Co. was not so indorsed, and also except that the one sent to Westervelt & Co. had stamped on its face "Duplicate—Not Negotiable," while the two sent to London were not so stamped. In the cases of the 17 shipments in question, Westervelt & Co. took their "Duplicate—Not Negotiable" bill of lading, indorsed on it "N. & P. Zito" or "Zito, Maniscalco & Co.," as the case required, then indorsed it "W. H. Westervelt & Co.," and filed it in the customhouse. The customhouse officials accepted it as a proper bill of lading, filed it with the consular invoice which they had already received, estimated the duty, and, upon receipt of the amount of duty, issued the usual customhouse permit for the delivery of the lemons. In some cases ink lines were drawn through the words, "Duplicate—Not Negotiable"; in other cases no such lines were drawn. It does not appear by whom these lines were drawn. In the case of 12 of the 17 shipments in question Westervelt & Co., after such entries at the customhouse, applied to Schulz & Ruckgaber for the original bills of lading, as though to use them in making the customhouse entries, and received them, but apparently made no use of them for that purpose. On June 7, 1905, Schulz & Ruckgaber first learned that the 17 shipments had been entered on the "Duplicate—Not Negotiable" bill of lading, and they have since held the original bills of lading covering the remaining five shipments. These suits are brought to recover the value of the 17 shipments, on the theory that the steamship companies had no authority to deliver the merchandise on customhouse permits granted on the "Duplicate—Not Negotiable" bills of lading, or without the production of the original bills of lading held by Schulz & Ruckgaber.

The lemons imported by Westervelt & Co. in the year 1905 were all sold at a heavy loss. The aggregate of the loss, of course, went on increasing as the business continued. The lemons imported were usually sold at an average of about 50 days after they were shipped from Sicily. As Westervelt & Co. were not to pay to Schulz & Ruckgaber the amount due on the drafts till shortly before the expiration of 90 days after their acceptance, considerable time passed between the sale of each shipment and the date when Westervelt & Co. paid the amount due on the draft drawn against it. During that time, in the ordinary course of business, in the spring of 1905, other shipments arrived and were sold, the proceeds of which were turned over to Westervelt & Co. The result was that Westervelt & Co. went on pay-

ing maturing drafts out of the proceeds of later shipments, until at length, about June 7th, the losses on the sales exhausted the funds of Westervelt & Co., and they informed Schulz & Ruckgaber that they could not make further payments to meet the maturing drafts. Thereupon further credits were refused, and the business relations between Westervelt & Co. and Schulz & Ruckgaber ceased; Westervelt & Co. owing Schulz & Ruckgaber about $30,000. At the same time the method by which Westervelt & Co. had entered the 17 shipments in question was ascertained by Schulz & Ruckgaber, and these suits were brought.

The general legal proposition upon which these suits are based, that a carrier which issues a bill of lading for merchandise intrusted to it for carriage is only authorized to deliver the merchandise to the order of the holder of the bill of lading, is fundamental. The libelants assert that the two original bills of lading sent with each draft to Fruhling & Goschen, and by them forwarded to Schulz & Ruckgaber, were the only bills which the steamers could legally recognize as authority for the delivery of the shipments; that the "Duplicate—Not Negotiable" bills sent to Westervelt & Co. were intended to be, and are understood in all mercantile circles to be, a mere copy of the real bills, and were sent to the importers merely for their convenience, and were not bills upon the production of which a delivery of the merchandise would exonerate the steamer; that, therefore, the delivery of the 17 lots of merchandise in question by the steamers to Westervelt & Co. was unauthorized, and the steamers are liable to Schulz & Ruckgaber for the value of the merchandise.

The respondents claim that the general principle of law relied on does not govern these cases. They argue that this is not the simple case of a single transaction, or of a series of separate transactions in which a banker advances cash or accepts a draft on the security of a bill of lading, but that the relations and liabilities of the parties must be determined by a consideration of the general course of dealing between them for many years; that Westervelt & Co. were carrying on a large and continuous importing business, under a general arrangement with Schulz & Ruckgaber for a banker's credit; that, in the first place, Westervelt & Co. were the purchasers, importers, and owners of the goods; that by their original deposit with Schulz & Ruckgaber of a dollar for every pound of credit, amounting to a little more than 20 per cent. of the purchase price, and by their payment of the freight, duties, insurance, and all charges of importation, as required by the provisions of the trust receipt, they had contributed as much as half or more than half the cost of the goods when landed on the dock ready for sale; that the interest of Schulz & Ruckgaber in the goods, as provided by the terms of the credit receipt, was that of a mere lienor holding them as collateral security for the repayment of amounts less than had been expended on them by Westervelt & Co.; and that, therefore, Westervelt & Co., as owners, had a right to demand the goods, and the steamers were justified in delivering them upon such demand. But in my opinion the simple answer to these facts is that Schulz & Ruckgaber held the bills of lading by which the steamships had agreed to deliver the goods only to the holders of

the bills or to their order, and that Schulz & Ruckgaber had not authorized any one to receive the goods when they were delivered by the steamships.

The respondents claim, in the next place, that, if Westervelt & Co. were not entitled to receive the goods as owners, they were entitled to receive them as the general agents of Schulz & Ruckgaber, having full authority to enter the goods at the customhouse, to receive the customhouse permit, and to take delivery of the goods from the steamship pursuant to the permit. They assert that by the express terms of the trust receipts, and by the unvarying course of dealing between the parties for 10 years previously, Schulz & Ruckgaber had never entered the goods or attended to any of the details of their entry, receipt, and sale; that Westervelt & Co. were always notified to come and take the original bills of lading with which to enter the goods, and had always done so; that in the 17 shipments in question Westervelt & Co. could have obtained the original bills of lading by simply calling for them; that whether the entry was made upon one of the original bills or upon the "Duplicate—Not Negotiable" bill was a matter which concerned the officials of the government only, and not Schulz & Ruckgaber; that as to Schulz & Ruckgaber Westervelt & Co. had general authority to enter the goods at the customhouse as part of the necessary proceedings by which they were ultimately sold and converted into money, and that the method in which the result was accomplished, was immaterial. But in my opinion the answer to all this is that, although Westervelt & Co. were general agents of Schulz & Ruckgaber in all other respects, they had no authority to obtain delivery of the goods except by the production of the original bills of lading. Schulz & Ruckgaber never authorized or knew of the use of the "Duplicate—Not Negotiable" bill with which to enter the merchandise and obtain its delivery, and, so long as they held the original bills of lading, the steamships had no right to deliver the merchandise to any other person.

The respondents assert that Schulz & Ruckgaber were bound to notify the steamships promptly of their interest in the merchandise, if they proposed to repudiate the authority of Westervelt & Co. to receive it; that the merchandise was perishable property; that, if not called for promptly, the steamships were not obliged to store it, but were authorized to sell it and hold the proceeds for whom it might concern; that, the goods being perishable, the customhouse authorities, under a Treasury regulation, were not allowed to store them under general orders, but were under a duty to sell them and hold the proceeds for those entitled to them, if the duties were not promptly paid; that, therefore, if Schulz & Ruckgaber did not produce the bills of lading promptly and take delivery of the goods, the steamships, either on their own motion, or by order of the government officials, could have unloaded the lemons and sold them; that by provisions in the bills of lading the steamships were exempt from liability for the goods under such circumstances after they left the ship's tackles; and that, therefore, they cannot be held liable when the same result was accomplished in another way while Schulz & Ruckgaber were negligent in exercising their rights under the bills of lading which they

held. But neither the steamships nor the government officers undertook to exercise their rights to unload and sell the fruit because it was perishable, or because of any delay in acting of Schulz & Ruckgaber, or because the fruit was not called for by anybody. The steamships delivered the goods to Westervelt & Co. upon their production of an invalid bill of lading. The fact that it was deposited in the customhouse, and that the goods were delivered on a customhouse permit, is, in my opinion, immaterial. The legal effect of the transaction was the same as though Westervelt & Co. had delivered the invalid bills of lading directly to the steamships, and the goods had been delivered in reliance on them.

The respondents. assert that it has been the custom of steamships in the port of New York for many years to deliver merchandise on the production of the customhouse permit, and not to require the production of the bills of lading; that by law one original bill of lading must be filed in the customhouse on the entry of imported goods; that in some cases only one bill of lading is issued; that, where more than one is issued, the others sometimes never arrive; that, when they do arrive, it is, in the usual course of business, by a subsequent mail, and sometimes a long time after the arrival of the first bill; and that to require the actual production and delivery to the steamships of an original bill of lading in addition to the customhouse permit for delivery would cause delay, inconvenience, and loss in all importing business, and particularly in the business of importing perishable goods. But the custom of a particular port cannot abrogate the specific agreement in all bills of lading that the merchandise is to be delivered to or upon the order of the holder of the bill. The strict maintenance of this rule is essential to the security of international commerce. Most of the vast business of importing merchandise from foreign countries is done by means of banker's credits, and it is vitally essential to such a business that the bills of lading held by the bankers should constitute an undoubted lien on the merchandise, so long as the bankers hold the bills. The steamship lines have undoubtedly found it convenient, and usually safe, to assume that, if the customhouse officials have issued a permit for delivery, a valid bill of lading has been filed with them. But, if the customhouse officials have been induced to issue a permit for delivery on an invalid bill of lading, that is, in my opinion, no more a protection to the steamship lines than if they had themselves accepted such a bill as valid, and delivered the merchandise in reliance on it.

[2] In the case of 12 of the 17 shipments in question; Westervelt & Co., after entering the goods on the "Duplicate—Not Negotiable" bill of lading, applied for and obtained from Schulz & Ruckgaber the original bills, and it is claimed that this constituted an authorization to receive the goods, and a ratification of the delivery already made. But no one can ratify an unauthorized act without knowledge of it. Schulz & Ruckgaber had no knowledge, when they delivered the bill, that the goods had been already entered, and they charge that Westervelt & Co. applied for the original bills in order to conceal the fact that they had already entered the goods.

I think, therefore, that the delivery of the 17 shipments in question upon customhouse permits issued on the production of the "Duplicate—Not Negotiable" bills of lading was unauthorized, and that Schulz & Ruckgaber have a valid claim against the steamships for any damage which they have suffered from such unauthorized acts.

[3] The real question in these cases is whether the libelants have suffered any damage. If Westervelt & Co. had misappropriated the 17 shipments or their proceeds, or any part of them, and had not applied such proceeds to the payment of the drafts, Schulz & Ruckgaber obviously would have suffered loss. But, in fact, Westervelt & Co. dealt with these 17 shipments exactly as they dealt with the others which were regularly entered. They deposited all the moneys which they received for the lemons in their bank account, and from it paid the maturing drafts. The libelants' claim is, as I understand it, that the unauthorized delivery by the steamships of the 17 shipments was a conversion, and that they are therefore entitled to recover the market value of the merchandise at the time of the conversion. By the common law the rule of damages for conversion was formerly sometimes applied in certain cases so as to produce a harsh and unjust result; but as Lord Justice Thesiger said in Hivot v. London, etc., Co., L. R. 4 Exch. Div. 188, "of late the tendency of the courts has been to treat this action [trover] with more common sense than it had been previously treated." But these are not common-law actions for a tort. They are suits in admiralty, to recover damages for breaches of maritime contracts to carry and deliver goods; and, in such cases, in the computation of damages, the real question is, not what the goods converted were worth, but what has the libelant lost. The Boston, 1 Lowell, 469, Fed. Cas. No. 1,671; The Lillie Hamilton (D. C.) 18 Fed. 327; 3 Parsons on Cont. (9th Ed.) p. 169; Dow v. Humbert, 91 U. S. 299, 23 L. Ed. 368. In determining that question, in the case of a failure to deliver goods imported from a foreign country, all the expenses of importation, such as duties, freight, insurance, and similar charges, must be deducted from the value of the goods, because the owner would have been obliged to pay them before he received the goods. The Boston, 1 Lowell, 468, Fed. Cas. No. 1,671; Arthur v. Cassius, 2 Story, 81, Fed. Cas. No. 564; Wallingford v. Kaiser, 191 N. Y. 397, 84 N. E. 295, 15 L. R. A. (N. S.) 1126, 123 Am. St. Rep. 600; Carver on Carriage by Sea (5th Ed.) § 727; Fisher v. Brown, 70 Fed. 570, 17 C. C. A. 225. Moreover, in view of the actual course of business between the parties for many years, in which there was no attempt to apply the proceeds of any particular shipment to the payment of the draft drawn against it, but the drafts were paid as they matured, out of the general bank balance, which was in conformity with the provisions of the credit receipt, which gave Schulz & Ruckgaber a lien on the merchandise imported, not only for the payment of the drafts drawn against it, but "for the payment of any other obligation due or to become due to them or either of them from us," it is, in my opinion, unnecessary as well as impracticable to undertake to consider the 17 shipments in question as separate and distinct from the other shipments. In considering the

191 F.—48

question whether the libelants have suffered damage from the unauthorized entry of the 17 shipments, the entire season's business should be considered. The evidence shows that the entire net proceeds of the lemons imported by Westervelt & Co. under the credits extended by Schulz & Ruckgaber, between January 1, 1905, and June 7, 1905, when the business ceased, after deducting all amounts paid by Westervelt & Co. for duties, freights, insurance, commissions, and other incidental charges, were $88,006.73. This was the amount which Schulz & Ruckgaber would have realized if they had sold the goods themselves, and there is no claim that the sales were not properly made, or that any larger amount could have obtained by any other method of sale. But during this same period Westervelt & Co. paid to Schulz & Ruckgaber $111,734.59, which included all the proceeds of the sales, and was about $23,000 more than the net results of the sales. It would appear, therefore, from these figures that Schulz & Ruckgaber had suffered no damage from the unauthorized entry of the 17 shipments by Westervelt & Co.

But the counsel for the libelants asserts that most of the money paid over was not the proceeds of the lemons, and that, therefore, his clients have not received such proceeds. This claim is based on the fact that Brown & Seccomb and the Fruit Auction Company, the auctioneers who sold the lemons, made advances to Westervelt & Co. of $1.50 a box on the arrival of the shipments, in order to provide funds for the payment of duties, freight, and other charges of importation, which were charged in the accounts rendered after the sale. The libelants claim, if I understand the claim correctly, that these advances were loans, the reimbursement of which absorbed to that extent the proceeds of the sales, and that the only proceeds of the sales of the lemons which reached Schulz & Ruckgaber were the cash balances paid over by the auctioneers on the final settlement of the accounts of sales of each shipment.

[4] But I think that this claim is untenable. The advances made by the auctioneers before the sales, it seems to me, were as much proceeds of the lemons as if they had been received after the sales; and the authorities seem to be to the effect that such advances, made by an auctioneer in anticipation of sales, are in law regarded as part of the proceeds. Haven v. Gray, 12 Mass. 71; Whitney v. American Ins. Co., 3 Cow. (N. Y.) 210, affirmed 5 Cow. (N. Y.) 712; Hundley v. Spencer, 1 Rob. (La.) 209. Brown & Seccomb were the auctioneers who sold all of Westervelt & Co.'s importations until May 4, 1905. On that date the Fruit Auction Company entered into a contract with Westervelt & Co. to sell their importations thereafter. As part of the contract the Fruit Auction Company agreed to advance $15,000 to Westervelt & Co., which amount was arrived at by assuming that Westervelt & Co.'s importations of lemons for the rest of the season would amount to 150,000 boxes, and an advance of 10 cents a box, or $15,000, was agreed on, for which a note payable in August was given. Although this money was paid over in reliance on its being repaid out of the profits of the future importations, I think that this advance was a loan, and cannot be deemed, in law, proceeds of the sales of the shipments; but the fact remains that it was received

by Westervelt & Co., deposited in their bank account, and paid to Schulz & Ruckgaber on maturing drafts, which accounts for most of the excess of the payments received that year by Schulz & Ruckgaber over the net proceeds of the sales. Assuming that this $15,000 was not proceeds of the sales, it was money which Westervelt & Co. obtained on the credit of the business, and which Schulz & Ruckgaber received in excess of what they would have realized if they had themselves taken possession of the lemons under their bills of lading.

But the libelants claim that Westervelt's unauthorized entry of the 17 shipments in question concealed the insolvent condition of Westervelt & Co., and caused Schulz & Ruckgaber to go on granting further credits, by means of which the total indebtedness of Westervelt & Co. and the consequent loss of Schulz & Ruckgaber was increased beyond what it would have been if the unauthorized entries had not been made. It is asserted that Schulz & Ruckgaber assumed, so long as Westervelt & Co. had not obtained from them the original bills of lading, that the shipments had not been entered and the proceedings not started which would result in a sale; but that, in fact, such goods having been entered, the sales were had earlier than Schulz & Ruckgaber supposed, and thereby funds were obtained which were applied to the payment of maturing drafts, and in this way the business was kept running and the indebtedness increasing longer than would otherwise have occurred. The libelants' counsel thus states his position in his brief:

"Schulz & Ruckgaber would have discovered Westervelt & Co.'s financial difficulties long before the confession of June 7, 1905, * * * if, in the first place, the steamship companies had not issued to the shippers the triplicate bills of lading 'to order' signed; * * * if, in the second place, the steamship companies had insisted upon the production of at least one original bill of lading before surrendering any particular shipment."

It was undoubtedly an act of carelessness on the part of the steamship companies to sign the bill of lading sent to Westervelt & Co. It was stamped, "Not negotiable," was only meant to be used as a copy, and in many instances such bills are, in practice, not signed by the officers of the vessels issuing them. The custom of providing in such bills that the merchandise is to be delivered to order, which seems to have become more usual in recent years than formerly, is also a careless one. If the bills in these cases had been made to the order of Fruhling & Goschen, on whom the drafts were drawn, the master's copy of the bill retained on the steamer would have shown that bankers held the bills of lading and had a lien on the goods, and the entry of the goods by Westervelt & Co. by means of the "Duplicate—Not Negotiable" bill of lading would have been much more difficult, and would probably not have been attempted. But I cannot perceive how the entries made on the unauthorized bills of lading protracted the business or increased the indebtedness. It appears in evidence that the original bills of lading in all but 4 of the 17 shipments in question were received by Schulz & Ruckgaber from London long enough before the sales to have permitted the merchandise to be entered upon them and sold at the same time and manner in which it was sold. It only takes an hour or two to make a customhouse entry. In the case

of the four shipments in which the original bills arrived after the sales, the sales took place only a few days earlier than they would have occurred if the entries had been made on the original bills of lading. These were the shipments on the Carpathia, in which the sale took place April 27th and the original documents arrived May 1st; the Cretic, sale May 5th, documents arrived May 15th; the Citta di Napoli, sale May 18th, documents arrived May 24th; and the Sicilian Prince, sale May 23d, documents arrived May 24th. The entry of the goods therefore by Westervelt & Co. on the unauthorized bills of lading did not substantially hasten the sale of the goods. Nor does it appear that there was any effort to hasten the sales. The evidence shows that the lemons were in most·cases held on the dock a considerable time before the sale, probably in the hope of a rise in the market price.

[5] But the essential consideration upon this question whether Westervelt & Co. prevented a quicker discovery of their financial condition, and consequently caused an increase of their indebtedness, by the unauthorized entry of the 17 shipments, is the fact that the payments made by Westervelt & Co. were payments not of specific proceeds of sales, but of amounts to meet the maturing drafts. Schulz & Ruckgaber paid no attention to the times when the sales were made. All the times and details of making the sales they left to Westervelt & Co. All they wanted was to be put in funds in season to meet the maturing drafts. The drafts had been accepted before the shipments arrived. The dates when the acceptances would mature were therefore all fixed before the unauthorized entries of the 17 shipments were made. If the effect of such entries had been to change the dates of the shipments or the maturity of the drafts, I can understand how they might have protracted the business and increased the indebtedness; but, as the shipments had already been made, the drafts accepted, and the time of their maturity fixed, I cannot see that it was of any consequence whether the lemons were sold immediately after their arrival or several weeks later. The proceeds of the sales were deposited in Westervelt & Co.'s bank account, and were checked against to pay drafts as they matured, and it seems to me entirely immaterial whether the deposits were made a few days earlier or later. As Schulz & Ruckgaber conducted the business, paying no attention to the details of the importation and sale of the fruit, the business naturally ran on till the losses became so large as to leave nothing to meet the next maturing draft. But as a matter of fact, on the evidence, most of the goods imported were sold at the same times when they would have been sold if they had been entered on the original bills of lading held by Schulz & Ruckgaber.

My conclusion is that, while the libelants have a technical cause of action, they have suffered no damage from the acts complained of. The libels in all the cases are dismissed on the merits, with costs to the respondents.